

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-13-00106-CV

Barry **BROOKS**, Heston C. King, Stefen Douglas Brooks, Johanna Barton,
and Jesse Rodriguez Benavides,
Appellants

v.

**EXCELLENCE MORTGAGE, LTD.**,
Appellee

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2013-CI-01173
Honorable Cathleen M. Stryker, Judge Presiding[1]

### OPINION ON MOTION FOR REHEARING

Opinion by:    Patricia O. Alvarez, Justice

Sitting:        Catherine Stone, Chief Justice, retired (not participating)
                Marialyn Barnard, Justice
                Patricia O. Alvarez, Justice

Delivered and Filed:  April 1, 2015

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

On May 30, 2014, we issued an opinion and judgment in this appeal. On July 14, 2014,

Appellants Barry Brooks, Heston C. King, Stefen Douglas Brooks, and Jesse Rodriguez Benavides

(collectively Brooks Appellants), and Appellant Johanna Barton, filed a motion for rehearing. On

---

[1] The Honorable Cathleen Stryker signed the July 18, 2012 order granting in part Excellence's traditional motion for summary judgment. The Honorable Peter Sakai, Presiding Judge of the 225th Judicial District Court, signed the severance order which made the July 18, 2012 order final.

October 17, 2014, Appellee Excellence Mortgage, Ltd. filed its response. We grant the motion for rehearing, withdraw our opinion and judgment of May 30, 2014, and substitute this opinion and judgment in their stead. We affirm the portion of the trial court's order granting Excellence's motion for summary judgment on Appellants' breach of contract claims. We reverse the portion of the trial court's order disposing of Appellants' antitrust and interference with prospective business relations claims, and we remand this cause to the trial court.

## BACKGROUND

Appellants worked as loan officers for Excellence during 2010. In September 2010, Excellence's owners began restructuring the company. The restructuring included discussions with Georgetown Mortgage, LLC and ultimately the creation of a new entity, MG Mortgage.

During the last week of September 2010, Excellence loan officers were trained by a corporate trainer from Georgetown. The loan officers were asked to sign employment applications for Georgetown. The Brooks Appellants contend the terms of their possible employment at Georgetown were much less favorable than the terms under which they were employed at Excellence. The Brooks Appellants each decided not to accept employment at Georgetown.

## A.    Appellants Leave Excellence

Appellant Johanna Barton was terminated from her employment with Excellence not later than September 28, 2010. On October 1, 2010, the Brooks Appellants each tendered signed letters of resignation to Excellence. By October 4, 2010, Appellants had accepted employment as loan officers at Premier Nationwide Lending. When Appellants left their employment with Excellence, a "pipeline" of pending interim and permanent residential mortgage loan transactions, in varying stages of development, had not yet been finalized. None of the ninety-one loans about which Appellants complain closed and funded before October 1, 2010.

Appellants notified at least some of the Excellence pipeline loan customers, with whom they had been working, of their move to Premier. Appellants contend that each pipeline customer chose to transfer their files from Excellence to Premier so the customer could work with the same loan officers to complete their transactions. Some pipeline customers subsequently sent letters to Excellence asking for their files to be transferred to Premier.

## B. Procedural Background

On October 7, 2010, Excellence filed suit for a temporary restraining order, injunction, and damages against Premier and each appellant. The trial court granted a temporary restraining order enjoining Appellants and Premier from, among other things, using Excellence's allegedly confidential information to contact any of Excellence's customers served by Appellants while employed by Excellence. Shortly thereafter, Excellence settled their claims against Premier. Premier returned the transferred pipeline loan files and agreed not to accept further transfers from Excellence. Appellants assert Excellence's actions prevented them from earning commissions on the pipeline loans and they suffered severe financial losses.

In March 2011, Appellants filed a counterclaim[2] against Excellence asserting various causes, including breach of contract, unlawful restraint of trade, and interference with prospective business relations. Excellence moved for traditional and no-evidence summary judgment against Appellants' breach of contract, interference, and antitrust claims. Appellants filed a response and moved for traditional and no-evidence partial summary judgment as to Excellence's claims: breach of contract, breach of fiduciary duty, tortious interference with prospective contracts, trade secret

---

[2] In their first amended counterclaim, Appellants added LATD-1, LLC; Grothues Financial, Ltd.; Grothues Brothers Management I, LLC; and Georgetown Mortgage, LLC as defendants (Grothues defendants). However, Appellants moved for summary judgment only against Excellence's claims.

misappropriation, breach of contract claim arising out of settlement agreement with Premier, and fraud.

After a hearing, on July 18, 2012,[3] the trial court granted summary judgment for Excellence against Appellants' (1) breach of contract claims for loans closed and funded after October 1, 2010, (2) interference with prospective business relations claims, and (3) antitrust claims. All the relief Appellants sought in their traditional and no-evidence summary judgment motions was denied. The trial court subsequently severed all the issues disposed of by the July 18, 2012 order.

SUMMARY JUDGMENT

**A.      Jurisdiction Over a Trial Court's Denial of Summary Judgment**

The first issue we address is whether this court has jurisdiction over the denial of Appellants' motion for summary judgment.

Appellants contend the motions for summary judgment are competing motions "on the same issues," *see Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) (permitting an appellate court to review orders on competing motions on the same issues), and thus the general rule that a party cannot appeal the denial of a motion for summary judgment is inapplicable, *see Gulley v. State Farm Lloyds*, 350 S.W.3d 204, 206 (Tex. App.—San Antonio 2011, no pet.) ("Generally, an order denying a summary judgment motion is not appealable because it is an interlocutory order and not a final judgment." (citing *Humphreys v. Caldwell*, 888 S.W.2d 469, 470 (Tex. 1994) (per curiam)).

Excellence counters that for the competing motions exception to apply, "both parties must ordinarily have sought final judgment relief in their cross motions for summary judgment." *CU Lloyd's of Tex. v. Feldman*, 977 S.W.2d 568, 569 (Tex. 1998) (per curiam). Excellence argues the

---

[3] In a Rule 11 agreement, the parties agreed the trial court would consider only Excellence's traditional motion; it would not consider Excellence's no-evidence motion.

parties only sought *partial summary judgment*—Excellence sought summary judgment on Appellants' counterclaims and Appellants requested summary judgment against some, but not all, of Excellence's claims.

The general rule is that a party cannot appeal the denial of a motion for summary judgment. *See Humphreys*, 888 S.W.2d at 470; *Cont'l Cas. Co. v. Am. Safety Cas. Ins. Co.*, 365 S.W.3d 165, 172 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). "The party's remedy is to assign error to the trial court's judgment ultimately rendered following trial on the merits." *United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). We may review such a denial when both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other. *Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 611 (Tex. 2012) (citing *Valence Operating Co.*, 164 S.W.3d at 661 (reviewing competing partial summary judgment motions)).

We conclude that Appellants' claims as to breach of fiduciary duty, breach of contract—confidential information, tortious interference, and misappropriation of trade secrets stem from, and are based on, the same factual elements and legal analysis as the relief sought by Excellence's motion for summary judgment; the competing motions are based on the same issues. Accordingly, we have jurisdiction over this appeal. *See Valence Operating Co.*, 164 S.W.3d at 661; *see also Lenk*, 361 S.W.3d at 611.

We turn to the substance of the summary judgment.

**B.      Standard of Review**

To prevail on a traditional motion for summary judgment, the movant must show "there is no genuine issue as to any material fact and the [movant] is entitled to judgment as a matter of law." TEX. R. CIV. P. 166a(c); *accord Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). A defendant movant may make that showing by conclusively disproving at least one

essential element of the plaintiff's claim. *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999); *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 476–77 (Tex. 1995).

To determine whether the defendant movant met its burden, we examine "the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). "We indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Rhône-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *accord Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007) (per curiam).

If the defendant movant meets its burden and the plaintiff's response fails to raise a genuine issue of material fact on each essential element, the defendant movant is entitled to judgment on its motion. *See Elliott–Williams*, 9 S.W.3d at 803; *Doe*, 907 S.W.2d at 476–77.

## C.     The Brooks Appellants' Breach of Contract Claims against Excellence

The trial court granted Excellence's traditional motion for summary judgment against the Brooks Appellants' breach of contract claims for commissions earned on the pipeline loans—those loans that closed and funded after October 1, 2010. The trial court did not grant summary judgment on the Brooks Appellants' breach of contract claims for loans closed and funded on or before October 1, 2010; those claims are not before us. On the Brooks Appellants' breach of contract claims that are before us, the parties disagree on the voluntariness of the Brooks Appellants' terminations, the effective dates of their terminations, and what compensation Excellence owes the Brooks Appellants.

*1. Arguments of the Parties*

Each of the Brooks Appellants concedes they submitted a letter of resignation effective October 1, 2010. They insist that it was not until after their resignations were submitted that they came to understand Excellence had ceased operations on September 22, 2010—nine days before their resignations otherwise became effective. The Brooks Appellants argue that when Excellence ceased operations, their employment with Excellence was involuntarily terminated. They argue their resignation letters had no effect because they *could not have resigned* from a company that *did not exist*. Thus, they contend, Excellence breached their employment contracts by failing to pay them commissions they earned including those associated with approximately ninety-one pipeline loans.

Excellence counters it did not breach the employment agreement because the Brooks Appellants were not entitled to commissions on loans that closed and funded after they resigned. Excellence asserts the Brooks Appellants were paid for employment through September 30, 2010, and they were properly compensated in accordance with the company's Production Personnel Compensation Plan. Excellence contends the Brooks Appellants voluntarily terminated or resigned and were therefore bound by the compensation provisions for voluntary termination. Excellence moved for summary judgment on the Brooks Appellants' breach of contract claims.

*2. Summary Judgment Evidence*

In its traditional motion for summary judgment, Excellence proffered the following summary judgment evidence.

a. <u>Kevin Sullivan Deposition</u>

In his deposition, Sullivan stated the following. For the period in question, he was the Chief Financial Officer of Excellence Mortgage. Excellence compensated its loan officers in

accordance with the Production Personnel Compensation Plan. The Plan applied to all of its loan officers including each of the Brooks Appellants.

### b.     Letters of Resignation

The Brooks Appellants submitted letters of resignation dated October 1, 2010. In their virtually identical letters, each asked to be paid their "commissions due for August and September 2010 closed loan files" "per my executed compensation plan with Excellence Mortgage."

### c.     Employment Contract Documents

Excellence, in its motion for summary judgment, attached copies of Employment Agreements for Robin C. Morton, Heston C. King, Barry A. Brooks, and Stefen Brooks; Confidentiality Agreements for January M. Goette and Johanna Barton; and a Production Personnel Compensation Plan for Heston King.

### 3.     *Brooks Appellants' Breach of Contract Claims*

We begin our review by determining whether Excellence met its burden to conclusively disprove any essential element of the Brooks Appellants' breach of contract claims. *See Elliott-Williams*, 9 S.W.3d at 803.

### a.     Elements of Breach of Contract

The elements of a breach of contract claim are "'(1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach.'" *McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 27 (Tex. App.—San Antonio 2004, no pet.) (quoting *Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 898 (Tex. App.—San Antonio 2002, no pet.)). Excellence moved for summary judgment on the ground that the Plan is a valid contract which defines its obligations to the Brooks Appellants, and it did not breach the Plan.

We turn to the applicability and provisions of the Plan.

### b. Production Personnel Compensation Plan Applies to Loan Officers

The summary judgment evidence contains a Plan signed by Heston King; no other Plans were proffered. In the Brooks Appellants' letters of resignation, each asked for payment in accordance with "my executed compensation plan with Excellence Mortgage, Ltd." Consistent with the letters of resignation, Sullivan's affidavit states that all the loan officers signed a Production Personnel Compensation Plan with the same terms as those in Heston King's plan.

Sullivan's statement was uncontroverted, "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." *See* TEX. R. CIV. P. 166a(c); *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989); *Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex. 1997).

Therefore, we conclude that each Brooks Appellant signed a Plan with the same terms as shown in Heston King's Plan, and the Plan's provisions apply to each of the Brooks Appellants.

### c. Loan Officers were Involuntarily Terminated

In their affidavits, the Brooks Appellants state they were involuntarily terminated because Excellence ceased operations sometime before October 1, 2010, and thus their letters of resignation were ineffective as a matter of law. Although Kevin Sullivan stated that the Brooks Appellants resigned voluntarily, under the applicable standard of review, we take the Brooks Appellants' affidavits as true and conclude they raised a genuine issue of material fact on whether they were involuntarily terminated. *See* TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548–49.

We next examine the Plan to determine which of its provisions apply to the Brooks Appellants' terminations.

### d. Production Personnel Compensation Plan

In the Plan, section VII, Termination of Employment, addresses a loan officer's termination.

#### (1) Voluntary Terminations

Section VII.A provides terms applicable "[i]n the event of voluntary termination." For voluntary terminations, the Plan requires Excellence to pay commissions the loan officer earned "on any loan closed and funded (as provided above in Section IV) up to and including the effective date of termination." The Plan also states the "Production Manager has the discretion to pay all, or a portion of, the commissions on loans that close and fund after the effective date of the Loan Officer's termination."

#### (2) Terminations for Cause

Section VII.B provides terms applicable "[i]n the event a Loan Officer is terminated by the Company for cause." In such a case, the Plan states "[n]o further commissions will be paid to the Loan Officer."

#### (3) Involuntary Terminations by Excellence

Section VII of the Plan states compensation terms for voluntary terminations and terminations for cause. But the Brooks Appellants assert, and we agree, the Plan is silent on what terms apply if a loan officer's at-will employment is involuntarily terminated by Excellence "for any reason or no reason at all," including for Excellence's convenience.[4] *See City of Midland v. O'Bryant*, 18 S.W.3d 209, 216 (Tex. 2000) (addressing at-will employment doctrine). In their brief, the Brooks Appellants suggest that if a contract is silent on an essential term or provision, courts may infer a reasonable contract term. We agree. We review the law regarding contracts which are silent on a question that the court must answer.

---

[4] We use the term convenience as a substitute for "any reason or no reason at all," *see O'Bryant*, 18 S.W.3d at 216 (addressing at-will employment doctrine), and to distinguish an involuntary termination for convenience from an involuntary termination for cause.

e.  Supplying a Missing Plan Term

"A court cannot make contracts for the litigants appearing before it.  But, there are instances where it can add to a contract already in existence or supply a missing term or provision." *In re G.D.H.*, 366 S.W.3d 766, 770 (Tex. App.—Amarillo 2012, no pet.) (citation omitted); *accord Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685, 690 (Tex. App.—San Antonio 2002, pet. denied) ("In certain situations, a court may uphold an agreement by supplying missing terms."); *O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 244 (Tex. App.—San Antonio 1998, pet. denied). When a valid contract exists, but the "contract is silent on an issue, Texas courts will infer reasonable terms." *Lidawi v. Progressive Cnty. Mut. Ins. Co.*, 112 S.W.3d 725, 731–32 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (inferring a contract term when reviewing competing motions for summary judgment); *accord Woodward v. Liberty Mut. Ins. Co.*, CIVA 3:09-CV-0228-G, 2010 WL 1186323, at *5 (N.D. Tex. Mar. 26, 2010) (quoting *Lidawi*); *Tex. Taco Cabana L.P. v. Taco Cabana of N.M., Inc.*, CIV.A. SA-02-CV-1209, 2005 WL 1397032, at *8 (W.D. Tex. June 10, 2005) (quoting *Lidawi*).  We assume the parties intended the contract to operate reasonably, and we may infer a reasonable term.  *See Lidawi*, 112 S.W.3d at 732 ("'Where the precise details of an agreement have not been defined by the parties, the court should assume the parties implicitly intended the agreement to operate in a reasonable manner.'" (quoting *State Farm Fire & Cas. Co. v. Tan*, 691 F. Supp. 1271, 1273 (S.D. Cal. 1988))); *O'Farrill Avila*, 974 S.W.2d at 244.

We will not supply a term that contradicts the parties' intent stated by the contract language. *Oakrock Exploration Co.*, 87 S.W.3d at 690; *Clovis Corp. v. Lubbock Nat'l Bank*, 194 S.W.3d 716, 719 (Tex. App.—Amarillo 2006, no pet.).  Instead, we look to the contract language for guidance in inferring a reasonable term.  *See Lidawi*, 112 S.W.3d at 732; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981) cmt. d ("[T]he probability that a particular term would

have been used if the question had been raised may be [a] factor[] in determining what term is reasonable in the circumstances."); *Bendalin v. Delgado*, 406 S.W.2d 897, 900 (Tex. 1966) (implying a reasonable sale price).

### f. Plan's Termination Compensation Terms

The Plan is silent on what terms should apply if a loan officer's employment is involuntarily terminated for Excellence's convenience. *See Lidawi*, 112 S.W.3d at 731. To infer a reasonable term in case of a loan officer's involuntary termination for Excellence's convenience, we look to the employment relationship documents. *See id.* Under the Employment Agreement, either the loan officer or Excellence could terminate the employment relationship for their own convenience.[5] Under the Plan, if the loan officer exercised the officer's right to terminate the employment relationship, Excellence must pay the loan officer the "commissions [earned] . . . on any loan closed and funded . . . up to and including the effective date of termination."[6]

### g. Supplying a Reasonable Term

For the following reasons, we conclude that a reasonable term for compensation in the event of Excellence's termination of a loan officer's employment for its convenience is the same compensation due for the loan officer's voluntary termination of employment for the loan officer's convenience. *See In re G.D.H.*, 366 S.W.3d at 770; *Lidawi*, 112 S.W.3d at 731–32.

Under the Plan the Brooks Appellants signed, upon the loan officer's voluntary termination, the loan officer was entitled to the commissions earned on those loans closed and funded up to and including the effective date of termination. The Brooks Appellants did not agree

---

[5] The Employment Agreement states "The employment relationship is 'at-will.'" An at-will employment relationship "generally can be terminated by either party for any reason or no reason at all." *O'Bryant*, 18 S.W.3d at 216; *accord Fed. Exp. Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993).

[6] In its sole discretion, Excellence could "pay all, or a portion of, the commissions on loans that close and fund after the effective date of termination." The Brooks Appellants do not assert that Excellence exercised its discretion to pay them commissions on loans closed and funded after October 1, 2010.

to receive less compensation, and Excellence did not commit itself to pay more compensation, than that specified for the loan officer's voluntary termination. Each party had a symmetrical right to end the employment relationship for their own convenience. *See O'Bryant*, 18 S.W.3d at 206 (at-will employment agreements). The Brooks Appellants accepted the Employment Agreement and the Plan, and the record does not show the Brooks Appellants sought to modify the Plan to include more favorable terms for termination for Excellence's convenience than for voluntary termination for the loan officer's convenience.

We conclude a reasonable term for compensation for a loan officer's employment being involuntarily terminated for Excellence's convenience is the same compensation due in the event of a voluntary termination by the loan officer for the loan officer's convenience: commissions earned "on any loan closed and funded . . . up to and including the effective date of termination." *See In re G.D.H.*, 366 S.W.3d at 770; *Lidawi*, 112 S.W.3d at 731–32.

We turn now to the question of whether Excellence breached its contractual obligations to the Brooks Appellants.

### h. Loans Closed and Funded After October 1, 2010

The Brooks Appellants claim Excellence breached their employment contract by failing to pay them the commissions they earned on loans closed and funded before, on, and after October 1, 2010.[7] As we have determined, Excellence had a contractual obligation to pay the Brooks Appellants the commissions they earned on loans closed and funded up to and including the effective date of their terminations. However, construing the Employment Agreement and the Plan, we also conclude Excellence had no obligation to pay the Brooks Appellants commissions

---

[7] Appellants also sued for damages under quantum meruit. Excellence did not move for summary judgment on, and the trial court's summary judgment did not dispose of, Appellants' quantum meruit claims. The quantum meruit claims are not before us.

on loans closed and funded after the effective date of their terminations. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (stating courts construe unambiguous contracts as a matter of law).

Regardless of whether the Brooks Appellants were involuntarily terminated before October 1, 2010, or they voluntarily resigned on October 1, 2010, their effective dates of termination were not later than October 1, 2010. Excellence met its burden to show it is entitled to judgment as a matter of law on the Brooks Appellants' breach of contract claims for loans closed and funded after October 1, 2010. *See* TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548–49. Therefore, as a matter of law, Excellence did not breach its contractual obligations to the Brooks Appellants by refusing to pay the commissions for loans that closed and funded *after* October 1, 2010. Thus, the trial court did not err by granting Excellence's traditional motion for summary judgment on the Brooks Appellants' breach of contract claims for loans closed and funded after October 1, 2010.

**D.      Johanna Barton's Breach of Contract Claims against Excellence**

Barton sued Excellence for, inter alia, breach of contract.[8] She alleged Excellence failed to pay her commissions she earned on loans closed and funded before, on, and after the effective date of her termination.

The trial court granted summary judgment against Barton's breach of contract claim for commissions earned on loans closed and funded after October 1, 2010.[9] As we have already concluded, under the Plan, Excellence was not obligated to pay commissions to any loan officer for loans closed and funded after the loan officer's effective date of termination. In Barton's case,

---

[8] Because Barton was subsequently hired by Premier, her other claims are properly addressed with the other appellants' claims, specifically the interference with prospective business relations and antitrust under the Texas Business and Commerce Code claims.

[9] The trial court did not grant summary judgment on Barton's claim for loans closed and funded on or before October 1, 2010, and that claim is not before us.

the summary judgment evidence shows Excellence terminated her employment relationship not later than September 28, 2010.

Without deciding whether Barton was effectively terminated prior to September 28, 2010, we conclude Barton's effective date of termination was not later than September 28, 2010. As a matter of law, Barton was not entitled to any commissions on loans closed and funded after her termination date. Thus, the trial court did not err in granting summary judgment against Barton's claim for commissions on loans closed and funded after October 1, 2010.

### E.      Appellants' Antitrust Claims against Excellence

After Excellence sought an injunction to prevent Appellants from contacting pipeline loan customers, Appellants countersued Excellence and the Grothues defendants. Appellants argued and proffered evidence that Excellence and the Grothues defendants prevented Appellants from competing for the pipeline loan customers and their actions comprise an unlawful restraint under the Antitrust Act. The trial court granted Excellence's motion against Appellants' antitrust claims.

#### *1.      Summary Judgment Burdens*

To be entitled to summary judgment, Excellence had to conclusively disprove at least one essential element of Appellants' claims. *See Elliott-Williams*, 9 S.W.3d at 803; *see also G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (per curiam). It also had to show there were no genuine issues of material fact and it was entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Elliott-Williams*, 9 S.W.3d at 803. Excellence was not entitled to judgment against Appellants' antitrust claims if, for each challenged essential element, the summary judgment evidence shows a genuine issue of material fact exists. *See Elliott-Williams*, 9 S.W.3d at 803.

*2.     Summary Judgment Evidence Requirements*

Appellants provided summary judgment evidence in their own motion and in response to Excellence's motion for summary judgment. Because both sides moved for summary judgment, we review *all* the summary judgment evidence "in the light most favorable to the party against whom the summary judgment was rendered." *See Mann Frankfort*, 289 S.W.3d at 848 (citing *Comm'rs Court of Titus Cnty. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997)); *see also Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010).

Appellants' evidence included affidavits showing Excellence's actions caused an adverse effect on competition. Although Appellants are interested witnesses, their affidavits—when examined to determine whether they raise a fact issue sufficient to defeat Excellence's traditional motion—are not required to be "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies." *See* TEX. R. CIV. P. 166a(c); *Fieldtech Avionics & Instruments, Inc. v. Component Control.Com, Inc.*, 262 S.W.3d 813, 827 (Tex. App.—Fort Worth 2008, no pet.); TIMOTHY PATTON, SUMMARY JUDGMENTS IN TEXAS: PRACTICE, PROCEDURE AND REVIEW § 6.03[9][a] (3d ed. 2013).

In reviewing Appellants' affidavits, unless an affiant's statement is entirely conclusory, *see Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997), we take the statement as true, and resolve all doubts and make every reasonable inference in the nonmovant's favor, *Nixon*, 690 S.W.2d at 548–49.

Before we examine the evidence, we review the elements of an antitrust claim.

*3.     Texas Antitrust Act*

The Texas Free Enterprise and Antitrust Act of 1983 prohibits "[e]very contract, combination, or conspiracy in restraint of trade or commerce." TEX. BUS. & COM. CODE ANN. § 15.05(a) (West 2011); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990); *see* TEX.

BUS. & COM. CODE ANN. § 15.01 (Title of Act). "To establish that a defendant contracted, combined, or conspired in restraint of trade in violation of section 15.05(a), a plaintiff must show that the alleged contract, combination, or conspiracy is unreasonable and has an adverse effect on competition in the relevant market." *Marlin v. Robertson*, 307 S.W.3d 418, 427 (Tex. App.—San Antonio 2009, no pet.).

### 4. *Evidence of an Antitrust Violation*

Appellants' summary judgment evidence of Excellence's alleged antitrust violation includes affidavits from Robin C. Morton, John H.P. Hudson, and Stefen D. Brooks. To determine whether Excellence conclusively disproved any essential element of Appellants' antitrust claims, we review the summary judgment evidence for each essential element. *See Elliott-Williams*, 9 S.W.3d at 803; *see also G & H Towing Co.*, 347 S.W.3d at 297.

#### a. Unreasonable Practice

The first element is an unreasonable practice. *Marlin*, 307 S.W.3d at 427. To evaluate reasonableness, courts divide practices into two categories; the first category is those that are illegal per se. *Id.* (citing *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). The second category comprises those "whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons for its imposition." *Id.* To this second category, "courts apply the 'rule of reason' under which the fact-finder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* (citing *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)).

#### (1) Robin Morton's Affidavit

Appellant Robin C. Morton was the former president and mortgage broker of Excellence. In her affidavit, she stated the following. As Excellence's president, she oversaw all facets of

Excellence's operations for approximately nine years. She was responsible to ensure "that all loans were property and legally handled as per state and federal regulations." A loan customer may ask the originating mortgage company to transfer their loan file to another mortgage company, and the transferring company is legally obligated to transfer the file. Until the transferring company receives the customer's signed request, it may not "share, release or disclose the information contained in a loan file in any way with the transferee mortgage company." Georgetown acquired the pipeline loan customer files from Excellence "without any type of transfer letter." When Excellence turned over the pipeline loan customer files to Georgetown, "Georgetown immediately filed an assumed name certificate and continued to do business under the name of Excellence Mortgage so as to represent to pipeline customers that their mortgage company had not changed." The pipeline loan customers, and others, "were intentionally misled to believe that they were still working with the same originating mortgage company, Excellence Mortgage, [Ltd.]" Excellence "falsely claimed [it] had the sole right to serve the pipeline customers," and it unlawfully compelled Premier to not accept any loan transfers for pipeline customers. By its actions to prevent Appellants from competing with Georgetown for the pipeline loan customers, Excellence had an adverse effect on the construction-to-permanent loan market in the greater San Antonio area.

(2)    John H.P. Hudson's Affidavit

In John Hudson's affidavit, he stated the following. He is the Area Manager with Premier Nationwide Lending, and he has over ten years' experience in the mortgage business. A prospective borrower is not obligated to remain with the original mortgage company. The customer may transfer their file at any time, but the transferring mortgage company may not transfer the file without the prospective borrower's written request.

(3)     Stefen D. Brooks's Affidavit

In Stefen D. Brooks's affidavit, he stated the following. Georgetown transferred all the pipeline loan customer files from Excellence "to its own computer system without obtaining a file transfer request from any of the loan customers." Excellence and Georgetown's attorneys sent letters to Appellants "telling us we could not serve [the pipeline] customers" to prevent Appellants from servicing the loans.

(4)     Kevin Sullivan's Affidavit, Deposition

Excellence moved for summary judgment against Appellants' antitrust claims on the basis that, as a matter of law, the employee nondisclosure and confidentiality provisions in Appellants' employment and confidentiality agreements were not non-compete covenants and could not unlawfully restrain trade. In Kevin Sullivan's deposition and affidavit, he stated that Appellants had violated the nondisclosure and confidentiality provisions by taking and using Excellence's confidential information to solicit pipeline customers. Excellence provided copies of an Employment Agreement and Confidentiality Agreement, and Sullivan stated each Appellant signed these documents.

(5)     Excellence Failed to Meet Its Burden

Considering all the summary judgment evidence, *see Mann Frankfort*, 289 S.W.3d at 848, and taking Appellants' evidence as true, *see Nixon*, 690 S.W.2dd at 548–49, it shows at a minimum that Excellence transferred files to Georgetown without first obtaining the pipeline loan customers' written requests, such transfers are prohibited under state or federal regulations, Georgetown and Excellence worked together to effect the transfers, and Excellence sought to prevent Appellants from competing for the pipeline loan customers. Thus, the summary judgment evidence raises a genuine issue of material fact on whether the complained of actions amount to an unreasonable practice. *See Marlin*, 307 S.W.3d at 427. Although Excellence argued and proffered summary

judgment evidence that it was merely protecting its confidential information under valid nondisclosure and confidentiality agreements, we conclude Excellence failed to conclusively disprove the essential element of unreasonable practice. *See id.*

> b. <u>Adverse Effect on Competition in the Market</u>

"To establish a violation under the rule of reason, a plaintiff must prove the restrictive practice has an adverse effect on competition in the relevant market." *Id.* at 429. The plaintiff must "prove what market it contends was restrained," prove "that the defendants played a significant role in the relevant market," and proffer "evidence of 'demonstrable economic effect.'" *Id.*

> (1) Market Restrained, Defendant's Role

In Morton's affidavit, she identified the restrained market as the construction-to-permanent loan market in the greater San Antonio area, and she stated Excellence had about fifty percent of that market. In Hudson's affidavit, he similarly described Excellence's niche market as arranging interim and permanent financing for new home builders. He stated that Excellence had a "substantial share" of this niche market in the Bexar County area.

> (2) Evidence of Demonstrable Economic Effect

Morton and Hudson stated that Excellence's actions had an adverse effect on Excellence's portion of the residential mortgage market in the San Antonio area. Both affiants had many years' experience as senior officers for mortgage companies operating in the greater San Antonio area. Morton identified "loan products offerings, interest rate options, [and] closing cost packages" as items affected by competition. Accepting Appellants' evidence as true, we may also reasonably infer that Excellence's actions to prevent competition for pipeline loan customers in the greater San Antonio area would result in a demonstrable economic effect. Although "an inference of *possible* effect" is not enough to establish a violation, *Coca-Cola Co.*, 218 S.W.3d at 689, a

reasonable inference of demonstrable economic effect is sufficient to raise a fact issue, *see Humphrey v. Balli*, 61 S.W.3d 519, 523 (Tex. App.—San Antonio 2001, no pet.).

### c.     Fact Issue Raised

Excellence argued and proffered evidence to attempt to conclusively disprove any unreasonable practice on its part. *See Elliott-Williams*, 9 S.W.3d at 803 (conclusively disprove element); *see Marlin*, 307 S.W.3d at 429 (antitrust elements). However, taking Appellants' evidence as true and making reasonable inferences in their favor, we conclude Appellants met their burden to raise a genuine issue of material fact on each element of their antitrust claims. *See Nixon*, 690 S.W.2d at 548–49. Thus, Excellence was not entitled to summary judgment on Appellants' antitrust claims. *See Elliott-Williams*, 9 S.W.3d at 803; *Nixon*, 690 S.W.2d at 548–49.

## F.     Appellants' Claims of Interference with Prospective Business Relations

Appellants sued Excellence and the Grothues defendants for tortious or unlawful interference with prospective business relations. Appellants claimed Excellence intentionally interfered with Appellants' attempts to compete for the pipeline loan customers and Excellence's actions caused Appellants to lose the commissions on the pipeline loans. The trial court granted Excellence's motion against Appellants' interference claims.

### 1.     *Summary Judgment Burdens*

To prevail on summary judgment, Excellence had to conclusively disprove at least one essential element of Appellants' interference claims. *See Elliott-Williams*, 9 S.W.3d at 803; *see also G & H Towing Co.*, 347 S.W.3d at 297. We consider the elements of an interference with prospective business relations claim.

### 2.     *Interference with Prospective Business Relations*

A tortious or unlawful interference with prospective business relations claim has multiple elements. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)

(listing five elements); *Plotkin v. Joekel*, 304 S.W.3d 455, 487 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (same). One of the essential elements is that "the defendant's conduct was independently tortious or unlawful." *Coinmach Corp.*, 417 S.W.3d at 923; *accord Plotkin*, 304 S.W.3d at 487.

Here, Excellence moved for summary judgment only on the ground that its conduct was not independently tortious or unlawful. *See Coinmach Corp.*, 417 S.W.3d at 923. As we have previously concluded, Appellants raised a genuine issue of material fact on whether Excellence committed an antitrust violation—an unlawful act. Thus, Excellence did not meet its burden to conclusively disprove the only essential element on which it moved for summary judgment, and summary judgment on Appellants' interference claims was not proper. *See Elliott-Williams*, 9 S.W.3d at 803.

## CONCLUSION

Applying the applicable standard of review, we conclude the Brooks Appellants' employment relationships were involuntarily terminated by Excellence for its convenience and Barton's employment relationship was terminated by Excellence. Having construed the Plan as a matter of law, we conclude Appellants were entitled to commissions only on loans that closed and funded on or before their effective dates of termination. Because none were terminated after October 1, 2010, we conclude the trial court properly granted summary judgment for Excellence on Appellants' breach of contract claims for loans closed and funded after October 1, 2010.

However, Excellence failed to meet its burden to conclusively disprove any essential element of Appellants' antitrust claims. Taking Appellants' affidavits as true, and making every reasonable inference in their favor, we conclude genuine issues of material fact were raised in Appellants' antitrust claims.

Because Appellants raised a genuine issue of material fact on whether Excellence committed an antitrust violation—an unlawful act—and Excellence moved for summary judgment only on that element, Excellence was not entitled to summary judgment on Appellants' interference claims.

We affirm the portion of the trial court's judgment against Appellants on their breach of contract claims. We reverse the portion of the judgment on Appellants' antitrust and interference with prospective business relations claims, and we remand this cause to the trial court.


Patricia O. Alvarez, Justice